Today is number 4110283 in re Marriage of Nilles. Did I pronounce that correctly for the appellate Clark Walker and for the Appalachian would make the scene. Mr. Walker. Your Honor's court simply put the way I saw the appeal that was brought on behalf of the first is the duration of maintenance, whether the permanency award of maintenance was appropriate and supported by the case and the case law that's presented in the The second issue was the amount of the combined child support and maintenance as it related to the court's findings relative to the standard of living of the boy during the course of the marriage. The remaining two issues are much more compact. One was the division of uncovered medical expenses and the final issue was the division of assets and debts relative to the issue of permanency and maintenance. The primary concern or issue that's raised within our appeal is at what point in time is the duration of marriage disregarded by the courts completely as a legislative issue relative to the consideration of the issue of permanency. At some point in time, the trial courts by their interpretation of the authority that's out there are progressively getting to the point where there is no duration of marriage consideration that's taken into account for purposes of the issue of permanency. I've looked at the case law that's cited both in support of the trial court's finding. I concur that there is a partnership between the two litigants, husband and wife, that gives rise to an obligation when it comes to the issue of maintenance. But the issue of permanency is troubling. And the reason why the permanency issue is troubling, in my opinion, is that at this point in time, given the ages of the individuals involved in this particular case, you literally could have maintenance being ordered over a course of a 30 to 40-year time period for a 13-year marriage followed by a two-year separation leading up to the trial. And my concern here is this. Ultimately, some of the cases say there can be maintenance for a period of a term of a year subject to a review, and ultimately that might have been a common ground or a middle ground application that the court could have considered. By making a permanency award, ultimately it left the petitioner in the position of having to come back in 15 or 20 or 25 years later on and say, well, I've been married for 13 years, but I've been supporting this individual for 25. And the problem I see with that is that at some point in time, you're going to have high-wage earners at the onset of their marriage, if they don't have a prenuptial agreement, have a situation where they're confronted with four years of sufficient time, five years, six years, seven years of sufficient time that's going to automatically create permanent obligation for maintenance because they may have that disparity of earning capacity at the onset of their marriage. And so I believe that the problem with the current interpretation by the trial court that was abusive in nature was that the court completely disregarded the factors as to the duration and simply said, well, if this individual, if the respondent, was never going to be in a position to be able to have an earning or earning capacity that would meet the standard of living that would have been enjoyed during the course of the marriage, it's automatically a permanent maintenance situation. Counselor, are you arguing that it is clear the trial court did not consider at all the duration of the marriage in establishing the... I don't think the court in its opinion ever expressed, and based on its rationale and within its opinion, ever expressed that there was a consideration for the fact that there was 13 years of marriage that comprised of the time period from the time they were married to the point where they were separated. And I think that's the operative considering process. I mean, the dissolution process may go on for years following as it leads up to a trial. But there's no indication of that. And part of the argument that was made by the respondent as part of the appellee's brief is we can go as low as eight years based on some of the opinions and rulings of other courts. The dilemma I have is it relates to those cases, if you're going to embody the rule of law that's outlined in Mayhaw and some of the other cases, then embody all of that rule. And that segues into the second issue. The second issue is the amount of the combined child support and maintenance. And it's akin to an equal protection issue. And what I mean by that is this. The standard of living enjoyed during the course of marriage isn't one exclusive to the support recipient. It's one that also has to be protected and embodied for the support payor. And there's plenty of cases, and all the cases say, hey, we can take into account or the trial court ought to take into account the ability to pay or whether or not an individual who's being asked to provide the support, whether they're going to still be able to enjoy the same standard of living themselves. In this particular instance, the facts were very clear. The facts were essentially this. The petitioner had or the appellant had $42,000 approximately of gross income by the projections that were made by the respondent's expert. The net income was right at the range of $26,000 to $27,000. And it was presumed that the... Per month. Per month. And that the respondent or the appellee's income could be $1,300 a month if she worked full time and she didn't. She essentially was working somewhere between 15 and 20 hours a week. The projected household gross or household net income between the two of them was somewhere in the neighborhood of $26,000 to $27,000 a month. And the problem was the court's award of $17,000 of combined child support and maintenance without regard to the income that the respondent could earn had presented two problems. First and foremost, it essentially left roughly about $11,000 left over at the end of the month of net income to the petitioner in this particular cause. Secondly, she had her own income, so if she actually worked and accepted full time employment, she could have as much as $18,500. And the opinion that was rendered by the respondent's expert during the course of trial was if the award for maintenance that was originally requested, the combination of which was somewhere in the neighborhood of $21,000 a month, she would only have $2,000 a year in terms of tax liabilities on those funds. If she was awarded less funds, and we were specifically asked if you were awarded $6,500 a month, is there going to be any tax liabilities? And Respondent 38, that's part of the appellee's brief, and it's also one of the matters brought within the record on appeal, basically suggested the testimony was there will be no tax liabilities on those because she has tax shelters arranging somewhere in the neighborhood of $70,000 before we get into any kind of specific deductions. So as a result, all of the $17,000 that was ordered was net income to her. In addition, if she had $13,000, $14,000, $15,000 a month of net income that she could receive if she was working on a full time basis, she was left with $18,500, and it left the support albegore with $10,500 or $11,000 a month to live on, and on the same standard of living enjoyed during the course of marriage. How many people are living on his income? Well, it's interesting that issue was raised up as part of the argument, but keep in mind, even if a custodial parent has three children living with her, she has to have a house capable of housing four people, as does the support albedore who has frequent visitation and contact with the children. I mean, there was no mathematical analysis as to whether or not there was five days in a 14-day sequence at the visiting parent's home versus nine days at the other residence, but each residence would have to be suitable to be able to house the children. Each of the residences would have to be able to have clothing and whatnot, and the things that would have the same standard of living. If we get to a point, none of the case law, there is not a single bit of case law out there that suggests the argument that was made by the respondent, or that was the premise of the testimony by the respondent's expert, which was you calculate out child support, and you excise that out of the equation, and then you figure out what's the remaining net income, and you figure out how to divide that up, or gross income, you divide that up for purposes of maintenance, and that was the argument for the $21,000. The problem is, first and foremost, is whether there's not a single case that says that that's the law whatsoever, the problem is that specifically, in this case, you can figure it out, there's 32% of his net income for child support, then you have maintenance, if you have 68% of what's left over, you're really saying one party has 34% of the income, because gross is the same as net in the scheme of things, and the other person has 66% of the income, and they're still both going to have to have households capable of taking care of these children. The second dilemma is that doesn't even take into account the fact that there's taxes that accrue and inert against the support payor, because they still have to pay Medicare and Social Security all the way up to the max, where there's no obligation on that to the support recipient, and so the net end result was that it's a big flaw. He does get to deduct the maintenance payments. He does, but he still has to pay Social Security and Medicare on those funds. But the real core of this is this. None of the cases that were cited in the appellee's brief ever presented a situation where there was a two-thirds to one income differential. There were many cases where the court said, you know, there's an insufficient amount of maintenance and we're going to send this back down to the trial courts. I'll give you an example. Nord was a case that was brought up on appeal. In that particular case, the wife received $204,000 a year or $17,000 a month, maintenance, and the support payor was complaining about it, but the trial court found he had $800,000 a year of income. That left him just shy of $600,000 a year or three-quarters of the income. Even in the cases that were cited in support of, well, that you can have an equalization process, all the equalization processes never even contemplated that the equalization would be excluding child support as if that didn't go to household needs. But Nord didn't have any minor children. You're exactly correct. The real problem in this situation is this. All the way up to trial, the affidavit for financial affairs and the reasonable needs that were consistently testified by the petitioner indicated that the reasonable household expenses during the course of the marriage were $12,000, $13,000 a month. They lived together until June of 2008. Up until that time period, their gross household income was right at $26,000 a month, and the testimony was $18,000 a month. Even then, that would dictate what the standard of living enjoyed during the course of the marriage. Where did all the money go then? The reality of it is, is beyond the traditional expenses that were incurred, I think they did live beyond their means, okay? But living even beyond their means, if you had $20,000 of household... You're saying that their financial affidavit showed that their monthly expenses were $12,000 or $13,000, and he had $28,000 in income. Why isn't all that money sitting in the bank somewhere? Ultimately, there were additional... During the process, and somewhat disputed in nature, there was some liquidation of tax liens from back taxes that were owed. What happened was the petitioner, in this particular case, he was an employee within an emergency room services facility. He ultimately went out and practiced on his own. That first year, that practice plummeted down in terms of value because of revenue, and they had to borrow $750,000 within the business in order to get afloat. And then when insurance collectibles caught up with the process, the income rose significantly for the one year where it's aberrationally high, and then plateaued back off. A lot of the income that came on the year that shows $800,000 of income was used to pay off operational debt. I'm not even talking about that year in particular. You've indicated that the income net was around $27,000 a month. It was projected to be $27,000 if she was working full-time. It was more like $25,000, $26,000. And that their shown living expenses during the marriage were $12,000 or $13,000. Correct. But the income you're referencing is based on a $495,000 a year projected income, which wasn't what they had during the course of the marriage. What was the average of the income during the marriage? The average income was a gross of between, I think, $300,000 and $330,000, $340,000. So it was appreciably less, $165,000, $170,000 less a year, or roughly, you're talking $14,000 a month.  Exactly. And that all happened after the separation? Yes. And the courts can certainly consider it for purposes of income capacity going forward. And that's where it was at. But during the course of the marriage, that wasn't the income that they had. The income they had coming in was roughly $26,000 a month, and their net was somewhere in the $18,000 to $19,000 a month. It was testified that he was, just to stay even on the student loans, ultimately had to pay $1,000 to $1,500 a month just to keep up on the interest payments. What was the petitioner's proposal to the child support? The petitioner's proposal was something on the order of $9,500 a month for child support and about $11,500 roughly when it comes to maintenance for a combination of about $21,000. No, no, your client's the petitioner. The proposal was for a combination of $14,000 a month. I think it was $7,500 was the amount for child support, $6,500 a month in maintenance. So aren't we only $1,000 apart from what the court ordered? No, actually you're talking about a difference of $3,000 a month. Wait, you just said $6,500 and $7,500 was your proposal. $14,000. It was ordered $8,500 and $8,500. Oh, $8,500. $17,000 combination. And so the net end result, all of that $14,000 would have been net to the respondent in that situation and she'd be able to retain her $1,500 a month. Okay, why is she not paying income taxes? You indicated she had some shelters or something. Because the house ultimately, the parties lived in a house that was a $450,000-$500,000 home between the mortgage interest and the real estate tax shelters and also the fact that she could claim head of household deductions. I think her total exemptions and itemized deductions were right at $69,293 based on the expert testimony presentation analysis of the numbers. And so the net end result is the first $70,000 worth of income, no matter what, is passed as tax-free. And the court in awarding what was asked was, well, if she's tendered $6,500 a month in terms of maintenance, that's $78,000 a year, she won't pay any taxes on that money. And you said, yeah, that's correct. You said even if she receives the $11,000, the total taxes because of the total shelters and deductions she would have would be $2,000 a month or... So are you saying that if she were paid $6,500 a month in maintenance instead of $7,500 a month, she would have close to the same amount of money available for whatever she wanted to purchase? No, I think $7,500, she'd have another $1,000 because she won't have taxes on that. The testimony was that if it went all the way up to $11,500, the taxes on that would be $25,318. So it would be $2,000 of taxes on $11,000 of money. She could shelter all the way up to almost the entire $8,500 that she was awarded because of the amount of tax shelter that she has within the scheme of the house that she's living in. If I may, and I don't want to run up all the time on that particular issue, although I do think it's an important issue and it's fundamental as to why we're here. As the court can figure out, we've got one household now with $18,000 worth of household income and we've got another household with $11,000 worth of income subject to $1,000, $1,500 a month of student loans that are incurred for the purposes of generating income. They were what paid for him to get through law school and the parties lived together during that time period. But the dilemma is, some of it was marital, some of it was premarital in nature, but the dilemma is then they divided up the uncovered medical expenses 70-30 when there was no indication whatsoever that he was going to do something else with the health insurance coverage. It didn't make any sense whatsoever. It wasn't simply a 50-50 split of uncovered expenses given that there's a disparity between the two households in terms of the income available to them. In terms of the property matters, simply put, basically there was three primary assets that came into play that I believe the court made clear error when it comes to their calculations. There was a Thriven account that had a value of $41,000 in September, I believe, of 2008. From that Thriven account and during the course of the process, $15,000 was initially taken out to pay for attorney's fees. We won't even touch that particular issue for the time being. Subsequent to that and during the course of the proceedings, periodically there were quarterly tax payments that would have to come due. The two Chatsworth accounts, the valuation that was used by the petitioner, was based on a belief that we would be using valuation dates in January of 2010, if I'm correct. There was a value of the two Chatsworth accounts and we also wanted to include the quarterly estimated tax liabilities that were going to have to be paid right then and also on the income from the previous year. Because that was insisted upon, it was presented by the respondent. No, we want to use more up-to-date numbers. We want to use the numbers as of June of 2010. I got you. In June of 2010, the problem was, and what they would do is he would transfer from a money market account to Chatsworth, he would store up money throughout the course of a quarter to make the quarterly estimated payments or for the year-end payments, and eventually would transfer it over into a checking account and pay the money through the checking account for the quarterly estimated payments. The testimony is absolutely clear and the evidence is absolutely clear that what the judge did was he said, we're going to use one account, we're going to use the January date when it had a valuation of $14,167. And for the other account, we're going to use the June date that had a valuation of $26,000 and change. And the problem was, is there was a shifting between the two accounts during that same time period. We said, we're fine if you want to use January, use January. If you want to use June, use June, but do it for both accounts. The account only had $5 in change in it in June when the other account had been elevated up. So that's the first problem, there's a $14,100 in change error because of a double accounting. The second problem was, there was clear unrebutted evidence and it's shown right by the bank statements that $15,000 that's shown in the Thriven account that they used the valuation in September of 2008 is directly deposited out of the Thriven account into the Chatsworth account that I believe the court found there was a value of somewhere in the neighborhood of $26,000. Well, I don't mind if the court uses a valuation of $26,000 based on that time period, if that's what the court's going to do, but then you have to adjust the $15,000 that comes out of the Thriven account. Now I'm sure the argument's going to be, well, I believe I'm out of time. You'll have rebuttal, though. Ms. Wood? Yeah, please, the court, counsel. I stated in my brief in response to the Apollon's arguments that the standard of review for all four issues before the court is the same. It is an abuse of discretion standard. And this court, as well as other courts throughout the state, have made it clear as to how that's defined, that no reasonable person could adopt the position taken by the trial court. Is Mr. Walker correct in the final argument he made that there's a double counting here, that different valuation dates that counted an asset twice was moved from one account to another? No, Your Honor, I don't believe Mr. Walker is correct. In my brief, I outlined several parts of the transcript where testimony was elicited from Dr. Nellis by me on cross regarding many of the accounts that existed during this marriage and what was happening with those accounts during the pendency of the litigation and before the pendency of the litigation. And I cite direct quotes in my brief in that regard. And essentially what was occurring was this. Dr. Nellis was alleging that there was over $95,000 in tax liability, for example, that he paid off after the divorce was finalized. That was refuted properly twice, at a temp interim fee hearing and at final hearing. That that was, in fact, paid off before the divorce even started. There were several other debts that Dr. Nellis, and I've pointed those out in my brief, alleged he paid during the pendency of the case. It was proven that that, in fact, did not occur. It was proven that he had exclusive control over the entirety of the party's income. What about the argument that there were these accounts and there was a different valuation date used for the two accounts and money moved from one account to the other? There were different valuation dates used. And the judge made it clear in his final order that most of the valuation dates were the same, but not all. And the court didn't indicate specifically findings as to why that happened. But in my brief, I'm indicating to you that in equity, the court found its distribution to be equitable, for starters. Okay, so what you're saying is he's right, there's a double counting, but it's equitable. No, I'm not saying he was correct that there was a double counting. It was impossible to elicit from Dr. Nellis at trial why funds were going from one account allegedly to another, why monies were borrowed, where those monies that were borrowed were spent, why when there should have been excess funds available to meet those expenses he was borrowing in the first place. My client had zero access to bank accounts, assets of any kind. As in the Nord decision, husband control of the entirety of that. And so what my point was at trial, and I believe the court adopted this, is that it was impossible to understand Dr. Nellis' roadmap that he tried to create. His answer when I would ask him repeatedly, you know, how can we be sure that the $15,000 came from one account and went to another? I don't know. Where did the $20,000 you borrowed from Citizens Bank of Chatsworth go? I don't know. Isn't it true that the $95,000 in tax liability was paid off well before this case started? Yes, after I showed the release of the tax lease. What happened is it was impossible to map what Dr. Nellis was suggesting was occurring. And I believe the court adopted values that it thought were equitable. And the court pointed out that if we start adjusting values of any kind in this case, we have to look then at the entire totality of this estate. Because there were many things Mrs. Nellis requested that the court did not order as well. Now we didn't bring those before this tribunal because I don't think it's a no reasonable person burden that we could overcome. But my reading of the court's determination was a simple one. Inequity, this is what the court deemed appropriate. And it was impossible to follow Dr. Nellis' suggestions that there was money double counted and so forth. What about the argument that the division basically gives her two-thirds of the income and him a third because the child support is not counted? Your Honor, there's several points to that that I've listed in my brief as well. The first would be, I give an example. If in fact this were a case that both parties were employed at state funds and both netted $50,000 a year in income, and my client had custody of the party's three children, she would receive child support in the amount of approximately $16,000 a year tax rate, which would give her $66,000 annual net spendable income. Dr. Nellis would have roughly $34,000 spendable income. My client would have substantially more spendable income than her counterpart. However, she has custody of the party's three minor children. And it's presumed in Illinois, via our guidelines alone, which are considered minimum amounts of support, that that's proper. I do not believe a maintenance recipient receiving spousal support in lieu of employment income because of the sacrifices she's made throughout this marriage, which was 14 years of data separation, 16 data divorce, and that doesn't include the many years these folks were together before they got married, should be penalized because her income comes from a stream of spousal support rather than maintenance. I also take issue with Mr. Walker's math that he's presented, in that the testimony was not that she would not pay any tax. Interestingly, in this case, Dr. Nellis did not have an accountant provide calculations. He did not provide calculations. There was tax shelter taken into consideration when Mrs. Nellis' taxes were considered on the original maintenance award that we were requesting. She's going to pay about $18,000 for 18% in tax, which would net her off of this court's award about $15,000 a month. Let me ask you again. There is an overlap between child support and maintenance. Child support goes to a residence, clothing, feed the kids, all that, and a lot of that is in maintenance too. If you're providing a home for the kids, you're providing a home for the mother as well. So does it make sense to ignore the child support when dividing up maintenance? I don't believe the court did ignore child support, Justice Cook, because the child support that was requested by Mrs. Nellis was $9,200 a month. The court did not follow the statutory guidelines and awarded an amount less than that. The court did not equalize net disposable income. Guidelines don't make much sense sometimes, like in high-income earners and low-income earners. Child support guidelines are helpful, but they're sometimes when you have to do something else. Now, Mr. Walker said that she's getting $17,500 a month, a combination of child support and maintenance. $17,000 without the tax effect. $17,000, and he's getting $11,000. Is that right? I disagree. I think he's getting somewhere closer to $13,000 if we don't consider what tax shelters he may have, because those were unknown at the time of trial. He had yet to purchase a home in his name. So my client was allocated $55,000 in itemized real estate deductions. Dr. Nellis was not. So he very well may have much more net disposable income if he chooses to take his portion of the estate and invest it in things that will give him tax savings. The other piece of this we need to keep in mind is this. Mrs. Nellis' maintenance will depend completely on several things having to maintain themselves. She cannot remarry. She cannot live with another person on a conjugal basis. And she and her spouse have to be alive. The second piece of this is child support is going to end when the youngest child is emancipated. So this isn't a $17,000 award that's going to go on into perpetuity. At best, she's looking at $8,500 a month. Once the children are out of her care and the expenses that relate to those children end, less the tax she'll pay on that. And she'll have to give up certain decisions in life, i.e. to engage in a new romantic relationship, as her husband has done, in order to maintain that stream of income, which she relies upon completely with a high school diploma, no college credit, and giving her entire working career to this family. When did she graduate from high school? When did she graduate? The parties were married in 1994. I don't know, honestly, what year that was before they got married. Did she do anything regarding her career, going to college, getting hours? During the period they were just simply dating but not married, up until the time they had children? She received a handful of college credits in 1991. Twelve, I believe. Twelve. And the testimony was unrefuted, that my client started dating Dr. Nellis when she was 15. I believe he's just a few years older, so he might have been 17, 18, or 19. And she actually followed him before they were married, at different times during his residency and education. And all that testimony was laid out about things that she did following him, not yet as a spouse, but as his partner. As soon as the parties were married... Is that an issue in this kind of case? Is that something we're supposed to take into consideration? I think where you take it into consideration is this. This is a woman who has devoted her entire adult life to being Dr. Nellis' partner. And when they did, in fact, get married in 1994, he knew he was marrying a high school graduate. She was marrying a soon-to-be physician, whose income can be very high. They chose to have three children together. They chose that she would not pursue a career or education, but she would care for those children. It seems, though, like she had already made that decision prior to having children. We don't know that. That's why I'm asking, what did she do? She had pursued some college, but only had 12 hours of college credit. But if you look at the transcript, there was testimony about she actually followed Dr. Nellis to one of the places of his residence before they were married, took a job that did not pay huge amounts of money. But they were living off student loans at that time, which I think is what the brief said. Part of their expenses may have been subsidized by some student loans at that time. Mr. Walker seems to... I guess he didn't get into this explicitly, but I think her life expectancy would be around 80 years. I'm just guessing. She's 38 at the time of the disillusion. 13-year marriage, and now he's supposed to pay 42 years of maintenance. As I indicated at trial and again in my brief, I seriously doubt Dr. Nellis will be an ER doctor when he's in his 80s, or even in his 70s. And we know that in all of these cases, Mayhall, Holman, Moore, several cases that have come out of this district, with marriages this length or shorter, that permanency could possibly mean that. But the cases are clear coming out of this district, that when a spouse is employable at a very low amount of income or not employable at all, permanency is appropriate. It's always modifiable. So that's another piece of this pie. If she remarries... It depends on how the order is drafted. Who carries the burden of the modification. Absolutely. And I think this court has approved the Mayhall determination where the burden shifting to the payor was acceptable. In fact, I think the opinion even states the trial court's in a better position to make those review determinations. But my experience is that when you have permanent cases where maintenance is paid for a lengthy period of time, when the payor approaches a normal retirement age, not suggesting he wants to retire necessarily at 50, but a more normal retirement age, a court will certainly review maintenance and reduce or terminate altogether. There's no expectation that Dr. Nilles continues as an ER physician into his 70s or 80s or beyond. And the reality of it is, once the youngest child is out of high school, his obligation is only going to be $8,500 a month unless Mrs. Nilles can convince a court somehow to increase that. In my experience, it's very difficult to get maintenance increased even when child support ends. Is there any provision for college expenses? It's reserved completely. So the trial court has the right to award college expenses at some point in the future? Absolutely. Okay. It seemed to me that the argument you made at the trial court level was she needs this much maintenance so that she can rehabilitate herself and afford to go to school. In part, absolutely. But it didn't seem to me like there was really a plan by the court awarding permanent maintenance so she had much incentive to do that. Well, I think, first of all, as she testified at trial, it was impossible for her to set too much of a plan in place because during the pendency of this case, she was getting $5,000 a month cash. That's it. And did not know what the final outcome would be in terms of property and maintenance. Remember, this is a woman whose net estate in this case is $128,000 versus Mrs. Nord who received 25% of her husband's gross income. My client received roughly 20% of her husband's gross income. Mrs. Nord received $1.8 million in assets, $1.2 million more than her husband. My client has a $128,000 estate, which is the same as what her husband is being awarded, and has to pay off, refinance, or sell the marital residence next month, the residence she shares with her children. So her plans were certainly up in the air as to know what to do, what can I afford, what can I... I mean, one thing we do know, Mrs. Nilles did, that I don't see many wives of individuals of this income earning capacity do. She, as soon as the party separated her, shortly thereafter, took a job with a retail establishment in town, The Gap, and started working part-time hours even though she had a youngest child who wasn't even in kindergarten yet, and two others. I don't know many folks who do that, and she testified, it didn't make me a lot of money, but it's built my level of confidence. I've gotten out there, I've met people, and it's certainly a step in the right direction. Certainly, according to Mayhall, she doesn't follow through with a plan of attack as she'd like to. There is a modifiability issue there that the Mayhall decision indicates could be considered. But rehabilitative maintenance wasn't awarded. Permanent maintenance was awarded. So I don't see how that argument would get made down the road if she chooses not to rehabilitate herself. And that's what the appellee in Mayhall argued, that wait a minute, how do we prove a substantial change of circumstances on a non-event, essentially. But I believe it was this court's opinion, I know it was this court's opinion, that said that's an acceptable burden shifting, and that trial court can review modifiability, including if wife has not taken appropriate steps of rehabilitation. The maintenance board in Mayhall was only $214 every two weeks. But the income that Mr. Mayhall earned was tiny compared to this case. He netted $30,000 a year, paid child support on top of that, and then had to part with maintenance. I would also point out one other thing. Even if Mrs. Nilles rehabilitates herself, where is she going to be at now 40, 41 years of age, in comparison to her husband, whose income has gone up. And by the way, I want to point something quickly out, something quickly before my time is up. Mr. Walker is alleging that the 2008 tax return, where there was almost $800,000 in income, that didn't all go to the parties. That's not true. Dr. Nilles is paid through his partnership. What showed up on the individual tax return was income he was paid. The reason it was so high that year is because in 2007, before the parties ever separated and divorce was announced by Dr. Nilles, Dr. Nilles broke away from a previous partnership, created a new one. Their first year was $200,000 in earnings because they had to collect on bills. They had startup costs. Once that occurred and receivables came in, the next year the pendulum went up here. See what I mean? So the earnings went way up, averaged with 07, and then when you look at 09, which is probably a close year to what the average would be, we're looking at just shy of $500,000 a year. What about the duration of the marriage in relation to permanent maintenance? Sure. Can you call 13 years a lengthy marriage? Well, it was 14 as of time of separation and 16 as of date of divorce. I thought it was 13 at the time of separation. They were separated in early 2008 and married in 1994. So April of 1994, I believe, is when they were married, and I think the divorce was filed about that same time. I think this court has addressed that on a number of occasions, that we don't measure necessarily in years. We measure in terms of employability and ability to support oneself. Isn't duration of marriage one of the factors in considering the maintenance? Oh, absolutely. I'm not suggesting it's not. But when you look at the cases that have awarded permanent maintenance with marriages of this duration or less, May Hall, Meniere was only 19 years, Holman, 10, Moore, 7, the courts reiterated that same Meniere language that states if a spouse is employable only at a lower level of income or no income at all, permanent maintenance may be appropriate, even if this is not a 20-, 25-, 30-year marriage. Because the idea being, even if it were 13 years, if I take 13 years out of my life in my partnership with my husband, and I give up my career, or I don't pursue a career to take care of three children in his home, so he can be a busy physician and make the kind of money we make, is it appropriate when that marriage ends, when one party elects to step out of the marriage, for the person who made those non-tangible sacrifices to live at a much lesser standard of living? What value do we put on all of the things she did during this marriage that didn't earn a paycheck? And I think that's what those cases are repeatedly telling us. Now, if we thought that this was the case, we have a lot of cases in McLean County with physicians whose wives are nurses and are out of the field for a few years, or many years potentially, to take care of children and family, but have nursing degrees. And sometimes, not always, can get back into a nursing field and earn income at a $50,000, $60,000 rate. We're still getting permanent maintenance awards in those cases because their husbands are making $4,000, $5,000, $6,000, $7,000 and up. So, I just don't think there's a way for a person in my client's shoes... Even if she's only able to make $2,000 a month, shouldn't that amount be deducted from the maintenance award? Well, our calculations, if we were giving comparable amounts of net sports to income to both parties, Dr. Nellis would pay roughly $13,000 a month in maintenance. That wasn't ordered. I bring that up because that amount was based on my client earning minimum wage full-time, which she does not. So, when the court ordered substantially less, $8,500 a month, I don't know if the court was basing that on a presumption, too, that she could make $16,000, but the $11,000, $12,000 figure was presuming she was earning minimum wage, which is the best she could do at this juncture in her life. Honestly, Dr. Nellis didn't bring forward any evidence that she could do better. Yeah, brief indicates they were married in October of 1994 and separated in June of... Oh, wait. So, 2014. Okay. I apologize. No, that's all right. I just wanted to make sure. Sure. Counsel, you're out of time. Thank you so much, Your Honor. We will have rebuttal now. I'll try to state this quickly to the point. First and foremost, the support recipient and the parties were separated for two and a half years before the trial, or a little less than two and a half years. She never applied for full-time employment. She said she never sought full-time employment. She never applied for enrollment or sought enrollment in any type of educational institution. She did nothing, in my opinion, other than take a part-time job working $15 an hour at the Gap at minimum wage to mitigate her need for maintenance. Beyond that, in terms of the issue of the double accounting, it was the first thing raised. Appendix 10 and 11 pages of our brief specifically shows the June statement. Specifically, it shows the drive-in transfer of the $15,000 we're referencing. The reality of it is there was direct testimony at trial, but that was directly from the drive-in IRA that was for $41,000. Ultimately, all we're simply saying is if you're going to charge them with the $41,000 here, then you have to deduct the $15,000 from the threshold balance that they indicated was used at $26,540. That's all we're asking. There is direct corroborative evidence that indicates that the court ignored that or didn't pay attention to it. The court did not, in its opinion whatsoever, and I just reviewed it, make any reference or explanation why it used varying dates for valuation for either the two Chatsworth accounts or the Thriven account. I thought it was based on the dates of the statements that were used in the evidence. Actually, there were. Ultimately, we thought that the most operative dates dealt with the January statements. Frankly, there was some miscommunication as to whether there was agreement to use that as a valuation date. But if you use the June statements, the June statement and valuation included within the assets summary that was used and tendered by the respondent shows there's $5.95 in the other account where the court put the value at, I believe, $14,401. All we're simply saying is keep it consistent throughout. Now, he ultimately may be charged with what's in the Thriven account, but you can't count that $15,000 twice, nor can you add another $14,000. Didn't the court not take into account the attorney's fees money he withdrew? He was asking for credit for this $15,000 that went to her attorney's fees? Well, that we're not even touching on. But isn't that the $15,000 in the Thriven account? No, that was a separate $15,000. There was $41,000 in the account a few months after the parties separated, and all of it was exhausted by the pretrial dates of June or July of 2010. Part of the $15,000 came out, and the court rejected that. We were essentially saying at trial he should be charged with $26,000, she should be charged with $15,000. But of that $26,000, there was another $15,000 taken out that came to the balance that was shown within the Chatsworth account that had a balance shown at $26,540. That's a whole different $15,000 we're talking about. Ultimately, the court never made an explanation as to why that was the case, and we offered it up at the hearing at the petition on the motion to reconsider, saying, hey judge, we just want an explanation why these are inconsistent dates. In terms of the rest of the guidelines, there was almost no way to figure out exactly what the appropriate guidelines were based on even Respondent 38 and their expert, because it all presupposed an outcome in maintenance that you don't know until after the court's made a ruling. If you don't know how much maintenance is going to be paid and what's the tax consequences as related to the maintenance, it's almost impossible. If the court orders $7,000, he's going to have less tax shelter. If the court orders $10,000, he's going to have more tax shelter. Their numbers assumed he would be paying $11,275. That's where all their numbers are somewhat flawed in terms of what's going on. But what's clear is they used, if you look at the third column of their expert's exhibit, it says their net income was $214,000 after taxes. You'd have to add back in the itemized deductions and exemptions. But what was my client was left with the $147,631 of taxes and more that was never even dealt with by the court on the division of assets and debts. Nor did the court address the fact there was quarterly payments coming out of these accounts, the $26,000 or the $5 account. The problem was there was ongoing marital debt contemporaneous with what was going on. The $800,000, that's a misnomer. There was $750,000 worth of business loans taken out in the year prior. That's why there was a loss and the income went all the way down to $200,000 that they had to pay back. And they took substantial sums when the insurance proceeds started to come back in. The testimony from my client was he received $405,000 in funds and the rest of it was essentially his portion of the one-half payback on the operational loans that allowed the primus to operate during 2007 when there was no income coming in. Ultimately, there is nothing that suggests that he has a net income of $13,000. There's no evidence that suggests he had shelters. Ultimately, that's asking for the speculation that they said we shouldn't even look upon for purposes of the income. I think it's very difficult. And when they're suggesting, well, the maintenance may be, we're going to speculate that the maintenance was set based on that there's going to be child support that falls off. Well, the youngest child is going to have to be paid child support for the next 12 years. But I guarantee you there's going to be a petition to modify saying there's a substantial change in circumstances saying we want to increase the maintenance because now child support has fallen off. But they're essentially saying for that next 12 years or 13 years while the youngest child finally reaches the age majority, we should ignore the fact that there is essentially a 66% to 33% division of their combined income. Counsel? Yes. Thanks to both of you. The case is submitted and the court stands in recess until further call.